ATTACHMENT A

AO 108 (Rev. 06/09, modified by USAO-DC)  Application for a Warrant to Seize Property Subject to Forfeiture by Telephone

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br><br>IN THE MATTER OF THE SEIZURE OF ALL VIRTUAL<br>CURRENCY STORED WITHIN, OR ASSOCIATED WITH,<br>VIRTUAL CURRENCY ADDRESSES AND ACCOUNTS IN THE<br>CUSTODY OF TWO VIRTUAL ASSET SERVICE PROVIDERS | )<br>)<br>)<br>)   Case No.   25-sz-20<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the jurisdiction of the District of Columbia is subject to forfeiture to the United States of America under 18 U.S.C. § § 2339B and § 1956

*(describe the property)*:

SEE ATTACHMENT A, HEREBY INCORPORATED BY REFERENCE

The application is based on these facts:

SEE ATTACHED AFFIDAVIT, HEREBY INCORPORATED  BY REFERENCE.

☑ Continued on the attached sheet.

_____
*Applicant's signature*

Special Agent
_____
*Printed name and title*

Attested to by the applicant in according with the requirements of Fed. R. Crim. P. 41 by telephone.

Date:  03/25/2025

Digitally signed by Matthew J. Sharbaugh
Date: 2025.03.25 17:29:39 -04'00'

City and state:   District of Columbia

Matthew J. Sharbaugh, U.S. Magistrate Judge
*Printed name and title*

AO 109 (Rev. 12/09, modified by USAO-DC)  Warrant to Seize Property Subject to Forfeiture by Telephone

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br><br>IN THE MATTER OF THE SEIZURE OF ALL VIRTUAL<br>CURRENCY STORED WITHIN, OR ASSOCIATED WITH,<br>VIRTUAL CURRENCY ADDRESSES AND ACCOUNTS IN<br>THE CUSTODY OF TWO VIRTUAL ASSET SERVICE<br>PROVIDERS | )<br>)<br>)<br>)<br>)<br>)  Case No.   25-sz-20 |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE BY TELEPHONE

To:  Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the jurisdiction of the District of Columbia be seized as being subject to forfeiture to the United States of America.  The property is described as follows:

SEE ATTACHMENT A, HEREBY INCORPORATED BY REFERENCE.

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before    4/08/2025
<br>*(not to exceed 14 days)*

❑ in the daytime – 6:00 a.m. to 10:00 p.m.        ☑ at any time in the day or night, as I find reasonable
<br>cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge   Matthew J. Sharbaugh                                                        .
<br>*(name)*

❑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ❑ for _____ days *(not to exceed 30).*

❑ until, the facts justifying, the later specific date of _____.

Date and time issued:    3/25/2025                    *[signature]*        Digitally signed by Matthew J.
<br>Sharbaugh
<br>Date: 2025.03.25 17:29:52 -04'00'
<br>                                                                              *Judge's signature*

City and state:    District of Columbia                    Matthew J. Sharbaugh, U.S. Magistrate Judge
<br>                                                                              *Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>25-sz-20 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of: | | |
| Inventory of the property taken: | | |

| **Certification** |
|---|
|  I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br>Date:  _____    _____<br>                                                                                                     *Executing officer's signature*<br><br>                                                                     _____<br>                                                                                                         *Printed name and title* |

## ATTACHMENT A-1: PROPERTY TO BE SEIZED

Pursuant to this warrant, Tether Limited ("Tether") shall provide the law enforcement officer/agency serving this document with the equivalent amount of USDT tokens that are currently associated with the virtual currency addresses referenced below ("SUBJECT ACCOUNTS"). Tether shall effectuate this process by (1) burning the USDT tokens currently associated with the SUBJECT ACCOUNTS referenced below and (2) reissuing the equivalent value of USDT tokens to a U.S. law enforcement-controlled virtual currency address. That U.S. law enforcement-controlled virtual currency address will be supplied to Tether via separate cover. Tether shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate its implementation.

- TX87gnGg3un2GeTSsXXEE62KdTyF4WWFJd

- TVp7a1r4FGNgWE2ViskhcfVYxbyZRvpvmv

- TB6PG69uKdN6NJirx8PnV7mJMVh4XRZvzp

- TDyyV8bkNNfttzk3NvjGvLFobsGdYmig9J

- TQaNC6oaN8TVtvbVv7vDZUAhPZrfuP76Vp

- TFbDs69t3TmMxbjiVPKeQqeH65VdqnCkRg

- TPdbmSXTPnNedsXW2smdztWFRTozomoxmc

- TXtUP3zCt87Y3ayq6zycmPWQnoSoiaLYML

- TU8JS7nMLX6aEgNeTM8px3Szq6tUx8Z8Vu

- TCZWe2uJkkYNtwan8eEmziXUp7e3Pg4zA2

- TTL4Dc7iv27iQBDejyXtrSSQoYBf6WLWec

- TGmLbZiS4SAhxDwmQteQ2fhsKJQ7VfJLsv

- TA3aQxRwocYytqZBKqMPHPZT6pYvwGjLg1

- THeKAQbUnV58Hnt8WxwwXaC4EjzTquoVes

- TL4MeyPRooqL9UhCiqAHww7u2pNYs6guJS

- TSxBp5UrV7HDp7Zu5EJc1ijDWGWhwsfBFK

- TTzRqud2nVZJUSahxspmqjTHZKmfj3d9Uc

- TX8VZHoXwwGDvL75m7cZee1gyipac3p5PQ

## ATTACHMENT A-2: PROPERTY TO BE SEIZED

Pursuant to this warrant, Nest Services Limited ("Binance") shall send the entire contents of the virtual currency balances held on their platform and contained within their respective wallets and/or on their respective exchanges associated with the Binance User Identification Numbers referenced below ("SUBJECT ACCOUNTS") and provide the property to the law enforcement officer serving the warrant in a reasonably practicable manner.  Binance shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate the implementation of it.  Binance shall send the property from the SUBJECT ACCOUNTS to securely established law enforcement-controlled virtual currency wallet(s) provided by FBI which will be supplied to Binance via separate cover.  The SUBJECT ACCOUNTS are:

- 25065570

- 581991390

- 142810781

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEIZURE OF ALL VIRTUAL CURRENCY STORED WITHIN, OR ASSOCIATED WITH, VIRTUAL CURRENCY ADDRESSES AND ACCOUNTS IN THE CUSTODY OF TWO VIRTUAL ASSET SERVICE PROVIDERS** | **SZ No. 25-sz-20**<br><br>**Filed Under Seal** |

*Reference: USAO Ref. # 2023R01633;*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEIZURE WARRANTS**

I, ▮▮▮▮▮▮▮▮ being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a seizure warrant for all of the virtual currency stored within, or associated with, the following eighteen virtual currency addresses, which are in the custody of or controlled by Tether Limited ("Tether"):

| | |
|---|---|
| TX87gnGg3un2GeTSsXXEE62KdTyF4WWFJd | **("Target Property 1")** |
| TVp7a1r4FGNgWE2ViskhcfVYxbyZRvpvmv | **("Target Property 2")** |
| TB6PG69uKdN6NJirx8PnV7mJMVh4XRZvzp | **("Target Property 3")** |
| TDyyV8bkNNfttzk3NvjGvLFobsGdYmig9J | **("Target Property 4")** |
| TQaNC6oaN8TVtvbVv7vDZUAhPZrfuP76Vp | **("Target Property 5")** |
| TFbDs69t3TmMxbjiVPKeQqeH65VdqnCkRg | **("Target Property 6")** |
| TPdbmSXTPnNedsXW2smdztWFRTozomoxmc | **("Target Property 7")** |
| TXtUP3zCt87Y3ayq6zycmPWQnoSoiaLYML | **("Target Property 8")** |
| TU8JS7nMLX6aEgNeTM8px3Szq6tUx8Z8Vu | **("Target Property 9")** |
| TCZWe2uJkkYNtwan8eEmziXUp7e3Pg4zA2 | **("Target Property 10")** |
| TTL4Dc7iv27iQBDejyXtrSSQoYBf6WLWec | **("Target Property 11")** |
| TGmLbZiS4SAhxDwmQteQ2fhsKJQ7VfJLsv | **("Target Property 12")** |
| TA3aQxRwocYytqZBKqMPHPZT6pYvwGjLg1 | **("Target Property 13")** |
| THeKAQbUnV58Hnt8WxwwXaC4EjzTquoVes | **("Target Property 14")** |
| TL4MeyPRooqL9UhCiqAHww7u2pNYs6guJS | **("Target Property 15")** |
| TSxBp5UrV7HDp7Zu5EJc1ijDWGWhwsfBFK | **("Target Property 16")** |
| TTzRqud2nVZJUSahxspmqjTHZKmfj3d9Uc | **("Target Property 17")** |
| TX8VZHoXwwGDvL75m7cZee1gyipac3p5PQ | **("Target Property 18")** |

This application is also made to support seizure of the following three Binance Accounts, identified

via their User Identification numbers, which are in the custody of or controlled by Nest Services

Limited ("Binance"):

| 25065570 | **("Target Property 19")** |
|----------|------------------------------|
| 581991390 | **("Target Property 20")** |
| 142810781 | **("Target Property 21")** |

Together, both sets of accounts constitute the "**Target Properties**" and are described in the fol-

lowing paragraphs and in Attachments A-1 and A-2.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws

and duly authorized by the Attorney General to request a seizure warrant.

3.      I am a Special Agent with the FBI and have been since September 2022. While

employed by the FBI, I have investigated federal criminal violations related to high technology

and cybercrime, including violations of 18 U.S.C. §§ 1030 (Fraud and Related Activities in

Connection with Computers) and 1343 (Wire Fraud). I have gained experience through training

and everyday work relating to conducting these types of investigations. Prior to becoming a special

agent of the FBI, I earned a bachelor's degree in history, a master's degree in criminal justice, and

served more than seven years as a communications officer in the United States Marine Corps. I

have received training related to computer networking, virtual currency, and cyber security.

4.      Specifically, I have completed the FBI's Accelerated Cyber Training Program,

which included ten virtual currency courses. I am one of only three agents in the FBI Albuquerque

Field Office licensed to trace virtual currency via a Blockchain Analysis Software that has provided

reliable information in the past and have attended in-person training and conferences focused on

such. I have seized both virtual currency and fiat currency in federal criminal investigations. I have

obtained a Global Information Assurance Certification in Security Essentials and also a

certification on using Open Source Intelligence investigative methods. In addition to my direct experience, I have also had conversations with cyber investigators across the FBI regarding dozens of complex cases, including several involving virtual currency account and bank account seizures. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, analysts, witnesses, and agencies. This affidavit is intended to show that there is sufficient probable cause for the requested seizure warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.    As further described below, this affidavit is made in support of an application for a seizure warrant for funds traceable to, and involved in, a scheme to solicit donations of virtual currency to Harakat al-Muqawamah al-Islamiyya, commonly known as HAMAS, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Providing Material Support or Resources to Designated Foreign Terrorist Organizations), and to launder those donations on behalf of HAMAS. Thus, the **Target Properties** are subject to civil and criminal forfeiture: (1) under 18 U.S.C. § 981(a)(1)(G)(i) and 28 U.S.C. § 2461(c), because they constitute assets of a designated foreign terrorist organization, and property and assets that afford a person a source of influence over a designated foreign terrorist organization; (2) under 18 U.S.C. § 981(a)(1)(A) and 18 U.S.C. § 982(a)(1), because they constitute property involved in money laundering offenses intended to conceal or disguise the nature, the location, the source, the ownership, or the control of proceeds of a specified unlawful activity (to wit, 18 U.S.C. § 2339B), in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and conspiracy to engage in concealment money laundering in violation of 18 U.S.C. §1956(h); and (3) under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), because they constitute or are derived from proceeds traceable to a violation of specified unlawful activity (to wit, 18 U.S.C. § 2339B).

6.     Furthermore, virtual currencies are transferrable 24 hours a day, 365 days a year, including on public holidays. As such, an order under 21 U.S.C. § 853(e) would not be sufficient to assure the availability of the property for forfeiture, as criminal actors can dissipate virtual currencies at any time.

## LEGAL AUTHORITIES RELATING TO SEIZURE AND FORFEITURE

7.     Pursuant to 18 U.S.C. § 981(a)(1)(G)(i), "[a]ll assets, foreign or domestic . . . of any individual, entity, or organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in 18 U.S.C. § 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization" are subject to forfeiture to the United States. Violations of 18 U.S.C. § 2339B are included in the definition of a Federal crime of terrorism.  Section 98l(a)(l)(G)(i) thus covers two categories of property: (1) all assets, foreign or domestic, of individuals, entities, or organizations engaged in planning or perpetrating federal crimes of terrorism; and (2) all assets, foreign or domestic, that afford any person a source of influence over an entity or organization engaged in planning or perpetrating any federal crime of terrorism. *See, e.g.*, *United States v. All Petroleum-Product Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, Civil Action No. 20-1791 (JEB), 2021 U.S. Dist. LEXIS 189395, at *12–13 (D.D.C. Oct. 1, 2021) ("The Court concludes, as a result, that Defendant Properties likely afforded Madanipour and Mobin a source of influence over the IRGC because those properties were critical to furthering the affairs of the terrorist group's enterprise. The Government thus properly brought this action for forfeiture under 18 U.S.C. § 981(a)(1)(G)(i).") (citations omitted).

8.     Among the government's forfeiture authorities, the terrorism forfeiture provision applies to the broadest range of property. Specifically, Section 981(a)(1)(G)(i) provides for the

forfeiture of *all* property, foreign or domestic, of a terrorist organization or that affords a source of influence to any entity or organization over a terrorist organization, irrespective of whether the property has any nexus to a crime or to the United States. *See, e.g., United States v. One Gold Ring with Carved Gemstone*, Civil Action No. 16-CV-02442 (TFH), 2019 U.S. Dist. LEXIS 195423, at *1–2 (D.D.C. Nov. 7, 2019) ("§ 981(a)(1)(G)(i) covers all property 'foreign or domestic.' That is, the statute empowers the government to seek the forfeiture of property outside the United States, which may have never touched the United States. The broad expanse of this language is for forfeiture actions to reach all property of terrorist organizations.").

9.    Property that is involved in a money laundering offense (or conspiracy to commit a money laundering offense) is subject to forfeiture under both civil and criminal authorities. Pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property," and "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" a specified unlawful activity, such as a violation of 18 U.S.C. § 2339B, is subject to forfeiture to the United States. Similarly, 18 U.S.C. § 982(a)(1) provides that the "[t]he court, in imposing a sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."

10.    Property "involved in" a money laundering offense "includes the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (internal quotation omitted). "The statute sweeps broadly because 'money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme.'"

5

*United States v. Bikundi*, 926 F.3d 761, 793 (D.C. Cir. 2019) (quoting *Puche*, 350 F.3d at 1153).

Forfeitures can include untainted funds that are comingled with tainted funds derived from illicit

sources. *See United States v. Casey*, 444 F.3d 1071, 1073 (9th Cir. 2006) ("It is . . . clear that

Congress intended criminal forfeiture provisions to eliminate profit from certain criminal activi-

ties, including money laundering . . . ."); *United States v. Kivanc*, 714 F.3d 782, 794-95 (4th Cir.

2013) ("Consequently, when legitimate funds are commingled with property involved in money

laundering or purchased with criminally derived proceeds, the entire property, including the legit-

imate funds, is subject to forfeiture."); *United States v. Lazarenko*, 564 F.3d 1026, 1035 (9th Cir.

2009) ("[I]n a money laundering charge, the commingling of tainted money with clean money

taints the entire account. The money transferred from a commingled account does not need to be

traceable to fraud, theft, or any wrongdoing at all. It is enough that the money, even if innocently

obtained, was commingled in an account with money that was obtained illegally.") (internal cita-

tions omitted). When the laundering transaction is a purchase, sale, exchange, or disbursement, the

property that is bought, sold, exchanged, or otherwise the subject of the transaction is deemed to

be "involved in" the offense. *See, e.g.*, *United States v. Real Prop. Identified As: Parcel 03179-*

*005R*, 311 F. Supp. 2d 126, 130 (D.D.C. 2004) ("[T]he Court concludes that the government has

demonstrated that the aircraft was involved in a monetary transaction [a payment of specific un-

lawful activity proceeds to release a lien on the aircraft] involving the proceeds of specified un-

lawful activity. Clearly, this involvement renders the aircraft subject to forfeiture pursuant to 18

U.S.C. § 981(a)(1)(A).")

     11.     Title 18, United States Code, Section 981(a)(1)(C) subjects to civil forfeiture "[a]ny

property, real or personal, which constitutes or is derived from proceeds" of any "specified unlaw-

ful activity." The term "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) and

1961(1) and it includes, among other crimes, Providing Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B.

12.     In addition, 28 U.S.C. § 2461(c) provides that, "[i]f a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized," then the government can obtain forfeiture of property "as part of the sentence in the criminal case."

13.     This application seeks a seizure warrant under both civil and criminal authorities because the Target Properties consist of a transferrable, virtual currency that can easily be placed beyond process if not seized by a warrant.

14.     Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under § 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," if there is probable cause to believe the property is subject to forfeiture. Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for criminal forfeiture proceedings. Section 853(f) of Title 21 permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1355(a), which provides that [t]he district courts shall have original jurisdiction . . . of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress . . . ." This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States."

16.     This Court has *in rem* jurisdiction over the **Target Properties** and venue lies in this

Court pursuant to 18 U.S.C. § 981(b)(3) and 28 U.S.C. § 1355(b)(2), which provides that "[w]henever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought . . . in the United States District Court for the District of Columbia." *See, e.g.*, *One Gold Ring with Carved Gemstone*, 2019 U.S. Dist. LEXIS 195423, at *2 ("This court is the sole jurisdiction where such litigation is properly lodged. 28 U.S.C. § 1355(b)(2)."). Specifically, Tether Limited, the issuer of Target Properties 1-18, is domiciled in the British Virgin Islands. In addition, the Binance accounts constituting Target Properties 19-21 all belonged to users with foreign identification documents and addresses.

17.    The property may also be seized pursuant to 18 U.S.C. § 981(b)(3), 28 U.S.C. §§ 1355(b)(1)(B) and 1395(a), and 18 U.S.C. § 3238, because the criminal offenses under investigation were begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no offender is known to have, or have had, residence within any United States district.

## SUBSTANTIVE CRIMINAL OFFENSES

18.    <u>Providing Material Support or Resources to Designated Foreign Terrorist Organizations.</u> This investigation relates to the provision of material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B.

19.    18 U.S.C. § 2239B(a)(1) provides, "Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 20 years, or both." "[M]aterial support or resources" is defined as

    any property, tangible or intangible, or service, including currency or monetary

8

instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. §§ 2339A(b)(1), 2339B(g)(4).

20.    18 U.S.C. § 2339B(d) identifies several bases for jurisdiction over an offense under Section 2339B(a)(1), including when "the offense occurs in or affects interstate or foreign commerce." 18 U.S.C. § 2339B(d)(1)(E).

21.    <u>Money Laundering.</u> 18 U.S.C. § 1956(a)(1)(B)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. This activity is commonly referred to as concealment money laundering.

22.    The money laundering statute, 18 U.S.C. § 1956, also makes it a crime to conspire to engage in money laundering: "Any person who conspires to commit any offense defined in [section 1956] or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h).

## **DEFINITIONS AND BACKGROUND**

### **Background Related to Virtual Currency**

23.    **Virtual Currency**: Virtual currencies are digital tokens of value circulated over the Internet. Virtual currencies are typically not issued by any government or bank like traditional fiat

currencies, such as the U.S. dollar, but rather are generated and controlled through computer software. Different virtual currencies operate on different blockchains, and there are many different, widely used virtual currencies currently in circulation. Bitcoin (or BTC) and ether (ETH) are currently the most well-known virtual currencies in use. BTC exists on the Bitcoin blockchain and ETH exists on the Ethereum network. Typically, a virtual currency that is "native" to a particular blockchain cannot be used on a different blockchain. Thus, absent technological solutions those native assets are siloed within a specific blockchain. For instance, ETH (the native token on the Ethereum network) cannot be used on other networks unless it is "wrapped" by smart contract code. This wrapping process results in what is called Wrapped ETH or WETH.

24.    **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. Stablecoins achieve their price stability via collateralizations (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

25.    **Tether (USDT):** Tether ("USDT") is a virtual currency that resides on multiple blockchains. The value of USDT is tied to the value of the U.S. dollar; therefore, one unit of USDT is represented to be backed by one U.S. dollar in Tether Limited's reserves, making it what is known as a "stablecoin." USDT is hosted on the Ethereum and Tron blockchains, among others. USDT is issued by Tether Limited, a company that controls the smart contracts and treasury for USDT, which is domiciled in the British Virgin Islands. Because Tether manages the smart contracts for USDT, it can blacklist addresses containing USDT. For example, as is relevant to this application, Tether can blacklist addresses on the Ethereum network, rendering the USDT in the addresses inaccessible to whomever controls the private keys to the blacklisted addresses. In the

10

instant case, at the request of law enforcement, Tether acted to freeze/blacklist the USDT associated with the Target Addresses and has indicated that they will continue to do so until March 26, 2025, or it receives the instant warrant.

26.    **Tron (TRX)**: Tron is a blockchain network built to host decentralized applications with high speed, scalability and low fees. TRX is the native token used to power the network. TRC20 is a network protocol used for smart contracts, often enabling USDT transfers via the Tron blockchain.

27.    **Virtual Currency Address**: Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

28.    **Private Key**: Each virtual currency address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password, which is needed to access the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

29.    **Virtual Currency Wallet**: There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. The virtual currency wallets at issue for the purposes of this affidavit are software wallets (*i.e.,* a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys). A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

30.    Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds.

Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

31.     **Blockchain**: Many virtual currencies publicly record all of their transactions on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by the decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

32.     **Blockchain Explorer**: These explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses API[1] and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

33.     **Smart Contracts**: Smart contracts are computer programs stored on a blockchain that run when predetermined conditions are met. Typically, they are used to automate the execution of an agreement so that all participants can be immediately certain of the outcome, without any intermediary's involvement. The Ethereum network is designed and functions based on smart contracts.

34.     **Virtual Currency Bridge:** A blockchain bridge, otherwise known as a cross-chain bridge, connects two blockchains and allows users to send virtual currency from one chain to the

---

[1] API is an initialism for "application programming interface," which is a set of definitions and protocols for building and integrating application software.

other.

35.     **Virtual Currency Exchanges (VCEs)**: VCEs are trading and/or storage platforms for virtual currencies, such as BTC and ETH. There are generally two types of VCEs: centralized exchanges and decentralized exchanges, which are also known as "DEXs." Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (i.e., KYC checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States).

36.     **Blockchain Analysis:** As previously stated, while the identity of a virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain (*e.g.*, the Bitcoin blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity. "For example, when an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (*i.e.*, a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

37.     In addition to using publicly-available blockchain explorers, law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

38.    **Decentralized Finance (DeFi)**: Decentralized Finance, or DeFi, is an umbrella term for financial services on public blockchains, primarily the Ethereum network. The Ethereum network's native virtual currency is ETH. Ethereum was the first blockchain that offered various decentralized services within its network. To make these services possible, the Ethereum network allows other tokens besides ETH to run within the network. These tokens are known as ERC-20 tokens.

39.    DeFi is a term used to describe a financial system that operates without the need for traditional, centralized intermediaries. Instead, DeFi platforms offer an alternative financial system that is open for anyone to use, and that allows centralized intermediaries to be replaced by decentralized applications (or dApps). With DeFi, one can do most of the things that banks support—earn interest, borrow, lend, buy insurance, trade derivatives, trade assets, etc.—but it is faster than using traditional banks and does not require paperwork or a third party. DeFi is global, peer-to-peer (*i.e.*, directly between two people rather than routed through a centralized system), pseudonymous, and open to the public.

### Background of the Investigation

### I.    HAMAS and the al-Qassam Brigades

40.    Harakat al-Muqawamah al-Islamiyya, commonly known as HAMAS, was founded in 1987 as an outgrowth of the Palestinian branch of the Muslim Brotherhood. From its inception, HAMAS's stated purpose has been to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent holy war, or jihad. HAMAS has not only directed its violence and terrorism against Israeli targets in furtherance of that goal; HAMAS's leaders have also assailed the United States and American citizens, in retaliation for and in an effort to weaken

American support for Israel's right to exist and defense of that right. HAMAS has murdered and injured dozens of Americans as part of its campaign of violence and terror.

41.     HAMAS carries out terrorist attacks and armed conflict through the Izz al-Din al-Qassam Brigades (the "al-Qassam Brigades"), its military wing. The al-Qassam Brigades conduct suicide bombings and other terrorist attacks within Israel, Gaza, and the West Bank, and have done so for decades. These attacks have included large-scale bombings against Israeli civilian targets, small-arms attacks, improvised roadside explosives, and rocket attacks.

42.     On October 8, 1997, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act. On October 31, 2001, the Secretary of State also designated HAMAS as a Specially Designated Global Terrorist under Executive Order 13224. The Secretary of State has also listed the following aliases for HAMAS: Islamic Resistance Movement, Harakat al-Muqawama al-Islamiya, Students of Ayyash, Students of the Engineer, Yahya Ayyash Units, Izz Al-Din Al-Qassim Brigades, Izz Al-Din Al-Qassim Forces, Izz Al-Din Al Qassim Battalions, Izz al-Din Al Qassam Brigades, Izz al-Din Al Qassam Forces, and Izz al-Din Al Qassam Battalions.  To date, HAMAS remains a designated FTO.

## II.     The October 7 HAMAS Massacres

43.     On or about October 7, 2023, HAMAS and other terrorist groups, including the Palestinian Islamic Jihad ("PIJ"), another designated FTO,[2] launched a surprise assault into Israel

---

[2] On October 8, 1997, the United States Secretary of State designated Palestine Islamic Jihad – Shaqaqi Faction as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act.  On January 23, 1995, the Department of the Treasury also designated PIJ as a Specially Designated Terrorist under Executive Order 12947.  The Secretary of State has also listed the following aliases for PIJ: PIJ-Shaqaqi Faction, PIJ, Islamic Jihad in Palestine, Abu Ghunaym

("the October 7 HAMAS Massacres"). HAMAS began by firing thousands of rockets, and then HAMAS militants crossed into Israel. The militants infiltrated Israeli towns and army bases and took civilian and soldier hostages, many of whom they brought back to Gaza. Israel formally declared war on HAMAS in response to the attack and began a ground invasion of the Gaza Strip on October 27, 2023. According to news reports, the HAMAS assault that began on or about October 7, 2023, killed approximately 1,200 people, including American citizens. HAMAS also took more than 250 people hostage, also including American citizens. HAMAS publicly took credit for the attacks.

44.    In connection with the initiation of the October 7 HAMAS Massacres, on or about October 7, 2023, the supreme military commander of the al-Qassam Brigades, Mohammed al-Masri, a/k/a "Mohammed Deif," a/k/a "al Khalid al-Deif," issued a recorded message in which he "announce[d] the 'Al-Aqsa Flood' operation," and identified himself as "commander-in-chief of the Brigades of the martyr Ezeddine al-Qassam."

45.    Also on or about October 7, 2023, al-Masri stated in a message broadcast on al-Aqsa TV that the al-Qassam Brigades leadership had "decided to put an end to all the crimes of the occupation, and the time during which it was rampant without accountability has ended." He stated that in the first minutes of the October 7 attacks, HAMAS launched 5,000 missiles and artillery shells, and asserted that the "Al-Aqsa Flood" operation was launched in response to what al-Masri described as "crimes committed by the Israeli occupation and colonial settlers," and American and Western support for and international silence regarding the occupation. He also

---

Squad of the Hizballah Bayt Al-Maqdis, Al-Quds Squads, Al-Quds Brigades, Saraya Al-Quds, Al-Awdah Brigades.

instructed, "Today, whoever has a weapon should pull it out, this is its time, and whoever has no weapon should get his axe, Molotov cocktail, his truck, his bulldozer, or his car."

46.      On or about October 8, 2023, the day after the October 7 HAMAS Massacres had begun, Ali Baraka, HAMAS's head of National Relations Abroad who is effectively responsible for HAMAS's foreign relations,[3] appeared in a video interview aired on a Russian television outlet. During the interview, Baraka conveyed that "[a] limited number of HAMAS leaders knew . . . about the attack and its timing." Baraka stated that HAMAS's social activities had actually been a ruse, to "make them [*i.e.*, Israel and the international community] think that HAMAS was busy with governing Gaza, and that it wanted to focus on the 2.5 million Palestinians" living there, when "[a]ll the while, under the table, HAMAS was preparing for this big attack." In fact, Baraka stated that HAMAS had "been preparing for this [*i.e.*, the October 7 HAMAS Massacres] for two years." In response to a question about the hostages being held by HAMAS, Baraka stated, "There are also prisoners in the U.S. We want them. Of course. There are HAMAS members sentenced for life in the U.S. We want them too. Of course. We demand that the U.S. free our sons from prisons."

47.      The October 7 HAMAS attacks marked the beginning of what has become the Israel-HAMAS war. A ceasefire agreement between Israel and HAMAS was reached on or about January 15, 2025, and went into effect on or about January 19, 2025. On or about March 18, 2025,

---

[3] From 2011 to 2019, Baraka was HAMAS's representative in Lebanon. Baraka is based principally in Lebanon. On or about December 13, 2023, the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated Baraka as a Specially Designated Global Terrorist under Executive Order 13224. In announcing the designation, OFAC noted that, when he held the position of HAMAS's representative to Lebanon, Baraka "met with international diplomats based in Lebanon on behalf of Hamas and spoke in support of violent campaigns" and that "[a]ccording to [] Baraka's public statements, Hamas has long drawn on money and training from Iran and Iranian proxies like Hizballah while bolstering forces in Gaza."

the Israeli Prime Minister's Office released a statement indicating that he had authorized "the renewal of military action" against HAMAS.[4]

48.　　Between on or about October 7, 2023, and on or about February 26, 2025, numerous hostages taken by HAMAS have died in captivity or been released as part of a ceasefire deal with Israel.

### III.　　The History of HAMAS Virtual Currency Financing

49.　　Beginning in or about early 2019, HAMAS, through the al-Qassam Brigades, tested virtual currency fundraising by soliciting donations on its Telegram channel before shifting to direct fundraising through its official websites: alqassam.net, alqassam.ps, and qassam.ps.[5]

50.　　The al-Qassam Brigades boasted that bitcoin donations were untraceable and would be used for violent causes. Their websites offered video instruction on how to anonymously make donations, in part by using unique bitcoin addresses generated for each individual donor. However, such donations were pseudoanonymous. Through leveraging blockchain analysis, federal authorities seized virtual currency accounts, while also covertly seizing and operating the infrastructure behind alqassam.net.[6]

---

[4] *See* https://www.gov.il/en/pages/event-statement180325.

[5] I know these to be official websites for the al-Qassam Brigades based on a previous investigation and subsequent United States Department of Justice announcement. *See https://www.justice.gov/archives/opa/pr/global-disruption-three-terror-finance-cyber-enabled-campaigns*.

[6] Information obtained via the U.S. Department of Justice, *available at* https://www.justice.gov/archives/opa/pr/global-disruption-three-terror-finance-cyber-enabled-campaigns



Above: Bitcoin donation advertisement on alqassam.net

51.    In April 2023, HAMAS announced that it would stop receiving funds via bitcoin due to donor safety concerns. Statements on the website then called for donations to continue through other means.

## **PROBABLE CAUSE**

### **Finding Donation Addresses**

52.    In February 2025, FBI Albuquerque identified a terrorist financing network soliciting donations to the al-Qassam Brigades via virtual currency. On February 6, 2025, an FBI Confidential Human Source (hereinafter referred to as "CHS-1"), who is located in the United States and has provided reliable information in the past, alerted me to a Telegram post asking supporters to send an email to an address associated with the al-Qassam Brigades, fund[@]alqassam.ps, in order to donate.



<u>Above</u>: Post from the al-Qassam Brigades asking for support

Fund[@]alqassam.ps's email address is also posted at the bottom of the al-Qassam Brigades web-

site, https://alqassam.ps/arabic/. I know this to be an official website for the al-Qassam Brigades

based on a previous investigation and subsequent United States Department of Justice announce-
ment.[7]



<u>Above</u>: Contact information shown on alqassam.ps/arabic/

On February 10, 2025, CHS-1 emailed fund[@]alqassam.ps asking how the CHS could donate to

al-Qassam Brigades. Several hours later, CHS-1 received a response from fund[@]alqassam.ps in

Arabic, roughly translated to the following:

> *In the name of Allah, the Most Gracious, the Most Merciful*
>
> *"Go forth, whether light or heavy, and strive with your wealth and your lives in the
> cause of Allah. That is better for you, if you only knew." [At-Tawbah: 41]*
>
> *Dear sister/s: May Allah protect and care for you*
>
> *Peace, mercy, and blessings of Allah be upon you,*
>
> *May Allah reward you for your keenness to perform the duty of support and assis-
> tance to your mujahid brothers in Gaza; and we ask Allah Almighty to accept from
> you your efforts and giving. If you do not have experience in dealing with digital
> currencies, you can seek the help of a friend inside or outside your country, or go
> to a money transfer office or exchange in your country that has digital currencies,
> and show only the wallet information from this message; To transfer the support
> amount to it; it is necessary not to inform the party that will undertake the transfer
> on your behalf of our identity; to preserve your security.*
>
> *Attached is the address and data of our current digital currency wallet; which is
> received from all other platforms:*

---

[7]    Information    obtained    via    the    U.S.    Department    of    Justice,    *available    at*
https://www.justice.gov/archives/opa/pr/global-disruption-three-terror-finance-cyber-enabled-
campaigns

*Current wallet address:*

*TSWL3euRjZWXiFJgzuV9tYAGiwShtPWkZK*

*Please make sure to copy only the letters without any spaces before and after the letters; and it is preferable to extract the address from the code below:*

*Network Type:*

*Trc20*

*Currency Type:*

*USDT*

*Important Notes:*
*1. You can notify us of the value of the support and donation amount upon completion of the transfer process; to follow up on the receipt, God willing.*

*2. The wallet address is changed periodically to preserve your safety; therefore, the address is only valid for one transfer and support process; therefore, it is necessary to communicate via this email for any other new transfer process.*

*3. It is preferable not to use the "BINANCE" platform to transfer support; and not to enter any data indicating our official name so that your wallet is not blocked and for your safety as well (entering any fictitious data as the recipient of the transfer); You can transfer through the application: trust wallet, RedotPay, OKX, Kast, BYBIT...*

*Note: "BINANCE" can be used to purchase currencies only, then use another application to complete the transfer process.*

*4. We hope to circulate the official email for support and donations to the Al-Qassam Brigades: fund[@]alqassam.ps and published on the official website of the Brigades https://alqassam.ps; with the necessity of alerting our honorable audience that our response to their messages may reach them in the "junk" or "spam" mailbox and not in the Inbox; due to our access restriction policies.*

*May Allah write you the reward and reward you with all good,*

*And we ask you to pray for your brothers in Gaza and Palestine*

53.     Based on my training and experience, I know that terrorists and cyber criminals

often look for ways to obfuscate their online activity. Per the above message, the al-Qassam Brigades recommends donors avoid sending funds directly from Binance accounts. I have conducted in-depth virtual currency investigations and know Binance to be a commonly used exchange for users across the globe. However, I also know Binance maintains Know-Your-Customer (KYC) requirements to prevent fraudulent or illicit activity. Based on my training and experience, I also know other solutions listed, including Trust Wallet and Bybit, are commonly utilized to obfuscate the identity of the sender. By recommending these transfer solutions, the al-Qassam Brigades is seeking to receive funding while still attempting to protect the identities of their donors. Furthermore, I know USDT is a stablecoin that is widely used around the globe for different purposes, including, among other things, to finance criminal activities; and TRC20 is often chosen as a network because of its fast transaction speeds and low fees.

### Finding the al-Qassam Brigades Operational Wallet

54.    The FBI conducted virtual currency tracing and blockchain analysis on the USDT address that CHS-1 identified, TSWL3euRjZWXiFJgzuV9tYAGiwShtPWkZK, hereinafter referred to as "Donation Address 1". The FBI found that, despite al-Qassam's claims about operational security and each wallet being used to receive only one donation (cited above), Donation Address 1 received 34 deposits between on or about February 11, 2025, and February 21, 2025, totaling 25,211 USDT. The analysis indicated that Donation Address 1 completed six withdrawals on four separate occasions between February 12, 2025, and February 23, 2025. On each of the four occasions, the balance was emptied. The highest balance Donation Address 1 reached was 12,491.974213 USDT before it was emptied.



Above: A graphical representation of the flow of funds out of Donation Address 1

55.    Of the 25,211 USDT received, 23,618 USDT was sent directly to another address,

**TA3aQxRwocYytqZBKqMPHPZT6pYvwGjLg1**, hereinafter referred to as the "al-Qassam Bri-

gades Operational Wallet" or **Target Account 13**. Approximately 1,600 USDT of the 25,211

USDT was sent to a cluster of addresses on the public blockchain which, according to the Block-

chain Analysis Software, is associated with an entity named BTCTurk, a virtual currency exchange

operating out of Istanbul, Turkey. I have not requested records from BTCTurk due to concerns of

the exchange notifying customers. However, through the course of numerous investigations, law

enforcement has found the attribution of clusters provided by this Blockchain Analysis Software

24

to be reliable. Through the course of this investigation and many others, I have submitted hundreds of subpoenas or letterhead requests to virtual currency exchanges for records based on tracing and attribution via the same Blockchain Analysis Software, and in virtually every instance, the virtual currency exchange has been able to provide responsive records, or direct the FBI to a point of contact at the linked exchange, corresponding to the referenced transaction(s), thus confirming the Blockchain Analysis Software's attribution to the identified exchange. Your affiant is aware that in a few instances, subsidiaries of the listed exchanges themselves held records instead of the listed exchange. I submit probable cause exists to believe the Blockchain Analysis Software accurately identified the cluster of addresses displayed above as being owned by BTCTurk.

### Identifying Exchange Accounts, Over the Counter Brokers, and the Gas Wallet

56.    Your affiant requested records from multiple exchanges (other than BTCTurk) and identified several donors who contributed to Donation Address 1. Additionally, investigators looked at all that received donations on behalf of HAMAS (**Target Properties 1** through **18**) and traced the flow of funds out of those accounts to exchanges. Based on records from those exchanges, the FBI learned of several individuals conducting book transfers of donation funds between accounts held at the same exchange. I know, based on my training and experience, that book transfers are difficult to trace because they are performed on an exchange's internal ledgers and not reflected on any public blockchain, and for this reason they are often used to obfuscate the flow of funds. As an example, Binance users can send USDT directly to other Binance users, without any blockchain record of the transactions. Investigators are unable to trace the flow of funds through transactions like this with open-source tools, and are reliant on exchanges like Binance to provide records of the account-to-account transfers. Based on my training and experience, and the information learned from these exchange account records, I believe the al-Qassam Brigades has a

25

robust network of financiers who conduct a series of transactions with donor funds to obfuscate the ultimate destination.

57.    One of the recipients, as depicted in the above graph, received approximately 111,000 USDT directly from the al-Qassam Brigades Operational Wallet between January 23, 2025, and March 6, 2025. I was able to identify the address associated with this wallet through blockchain analysis software as a Binance wallet. I requested records from Binance on February 12, 2025, and learned that the owner of this wallet was **Binance User 142810781**; the wallet identified by this user ID is hereinafter referred to as **Target Property 21**. I received additional account records from Binance on March 14, 2025, which verified the blockchain records showing **Target Property 21** received 111,000 USDT directly from the al-Qassam Brigades Operational Wallet in a series of 14 deposits.

58.    Through blockchain analysis, I also observed the al-Qassam Brigades Operational Wallet send a portion of donated funds to an unattributed address.[8] Based upon observations in this investigation, and my training and experience, I believe HAMAS uses regional over-the-counter (OTCs) businesses to transfer virtual currency. These regional OTCs can be used to obfuscate the flow of funds and swap virtual currency into government-issued fiat currency. Blockchain records show transaction history with large amounts of transfers in a short period of time to and from many different sources for the two addresses labeled as "Presumed OTCs" in the above graph.

59.    On February 16, 2025, I met with Person #1 via video conference. Person #1 is the Head of National Security Intelligence for the Virtual Currency Tracing Service that makes the

---

[8] An unattributed address is a virtual currency address that law enforcement is still investigating to determine its owner.

26

Blockchain Analysis Software discussed above. Person #1 has been an industry expert who has provided reliable information in the past and has at least three years of experience in virtual currency investigations. The FBI requested additional information from the Virtual Currency Tracing Service about Donation Address 1 and flows of digital currency from that address.

60.    Person #1 indicated they had analyzed the donation network and found a recurring trend. Person #1 explained that the Virtual Currency Tracing Service identified what appeared to be many other donation addresses to the al-Qassam Brigades Operational Wallet. Each address received different amounts, but the vast majority of all transfers out of these donation addresses went to the al-Qassam Brigades Operational Wallet, as seen in the aforementioned example following Donation Address 1. Furthermore, Person #1 showed me that most of the transfers out of the donation addresses were paid for via the same "Gas Wallet." I confirmed what Person #1 showed me by reviewing publicly available information using the Blockchain Analysis Software.

61.    Gas Addresses refer to virtual currency addresses on blockchains that hold funds necessary to pay transaction fees, similar to how a car needs gas to run. I know, based on my training and experience, that addresses with outbound transactions paid for via the same gas address are almost always controlled by the same actor or group of actors, especially when the funds ultimately end in the same destination.  Based on my training and experience, I know USDT transferred on TRC20 networks require funding, or "gas," in order to transfer between addresses. Gas fees on TRC20 are paid using TRX, the native token used to power the Tron network. I know new USDT addresses on TRC20 take only a matter of minutes to create, but sending funds in order to fund transfers once donations are received requires organization and a consistent balance of TRX. Because of this, I also know that transfers paid for via the same gas funding address are almost always operated by the same actor or group of actors.

27



Above: A graphical representation showing the connection between the Gas Wallet and multiple donation addresses, including Donation Address 1 and seven additional donation addresses identified as described below

**Finding Additional Donation Addresses**

62.     Following the findings that the Virtual Currency Tracing Service shared, your affiant conducted additional blockchain analysis and discovered more connections showing likely historical donations, based upon the connection between the Gas Wallet and the al-Qassam Brigades Operational Wallet. Blockchain data shows that the al-Qassam Brigades Operational Wallet had received approximately 1,349,725 USDT between October 28, 2024, and March 3, 2025. Furthermore, more than 92% of outbound transfers from the al-Qassam Brigades Operational Wallet were

funded via the previously mentioned Gas Wallet.

63.    On February 17, 2025, another FBI Confidential Human Source based in the United States (hereinafter referred to as "CHS-2") alerted me to seven additional USDT donation addresses that CHS-2 received by emailing fund[@]alqassam.ps in the same manner as CHS-1 had previously done. I reviewed the email responses from fund[@]alqassam.ps to CHS-2 and found the email messages to be identical to the one that CHS-1 shared, except for the different donation addresses. The seven virtual currency addresses that CHS-2 received from the fund[@]alqassam.ps accounts were embedded in emails with the same text as the one quoted above. These addresses were as follows:

1. **TVp7a1r4FGNgWE2ViskhcfVYxbyZRvpvmv (Target Property 2)**

2. **TB6PG69uKdN6NJirx8PnV7mJMVh4XRZvzp (Target Property 3)**

3. **THeKAQbUnV58Hnt8WxwwXaC4EjzTquoVes ("Target Property 14")**

4. **TL4MeyPRooqL9UhCiqAHww7u2pNYs6guJS ("Target Property 15")**

5. **TSxBp5UrV7HDp7Zu5EJc1ijDWGWhwsfBFK ("Target Property 16")**

6. **TTzRqud2nVZJUSahxspmqjTHZKmfj3d9Uc ("Target Property 17")**

7. **TX8VZHoXwwGDvL75m7cZee1gyipac3p5PQ ("Target Property 18")**

64.    I conducted virtual currency tracing and blockchain analysis on all seven addresses obtained by CHS-2, finding the transaction pattern to be consistent with the pattern observed with Donation Address 1. In particular:

- All seven donation addresses received TRX to fund outbound transfers from the same previously identified Gas Wallet.

- The majority of all donations were subsequently transferred to the al-Qassam Brigades Operational Wallet.

- Based on additional records provided by Binance in response to requests for information, many of the funds sent out of the al-Qassam Brigades Operational Wallet went through a series of internal book transfers between different accounts at the same exchange, as with Donation Address 1.

- Some funds were transferred on the public blockchain to BTCTurk. As discussed above, Blockchain Analysis Software identified BTCTurk based on its own internal clustering and processes – which I have repeatedly found to be accurate in other investigations.

- A portion went to an unattributed address, which I believe to be a regional over-the-counter business based upon observed patterns of transactional behavior consistent with OTC businesses.[9]

- Addresses appeared to be in use for only a few days at a time and were completely emptied when the user withdrew funds from them.

Based on my training and experience, I know the transaction patterns discussed in the above bullets demonstrate that the virtual currency accounts are controlled by the same actor or group of actors.

65.    The total amount received through the observation of the above seven donation addresses was approximately 45,948 USDT over a period of two weeks, between February 14, 2025, and February 28, 2025. But I believe this is only a portion of the donation addresses used by the al-Qassam Brigades within this financing network during this period. During that same time the al-Qassam Brigades Operational Wallet received a total of 155,448 USDT from other addresses. Based on all aforementioned factors, I believe the al-Qassam Brigades Operational Wallet receives

---

[9] FBI personnel are currently working to gain attribution behind several unattributed wallets or addresses.

an average of approximately 75,000 USDT per week that is subsequently sent to finance terrorism.



Above: A graphical representation of donations through the seven addresses provided by CHS-2

## Further Investigation Identifies Additional Target Properties

### I.    Tether Addresses

66.    Based on my training and experience, and the investigation described herein, I believe all USDT addresses sent to potential donors by fund[@]alqassam.ps are used to provide material support to HAMAS. Between February and March 2025, FBI Confidential Human Sources CHS-1, CHS-2, and another FBI Confidential Human Source based in the United States (hereinafter referred to as "CHS-3"), that have provided reliable information in the past, emailed fund[@]alqassam.ps and requested virtual currency donation addresses. In response to these emails, the CHSs obtained the following four addresses:

| | | |
|---|---|---|
| **TX87gnGg3un2GeTSsXXEE62KdTyF4WWFJd** | **("Target Property 1")** | **Obtained by CHS-1** |
| **TVp7a1r4FGNgWE2ViskhcfVYxbyZRvpvmv** | **("Target Property 2")** | **Obtained by CHS-2** |
| **TB6PG69uKdN6NJirx8PnV7mJMVh4XRZvzp** | **("Target Property 3")** | **Obtained by CHS-2** |
| **TDyyV8bkNNfttzk3NvjGvLFobsGdYmig9J** | **("Target Property 4")** | **Obtained by CHS-3** |



Above: A graphical representation of connections between Target Properties 1–4

67.     As discussed infra, your affiant's training and experience indicates that all funds being sent to the al-Qassam Brigades Operational Wallet are intended to fund HAMAS. Based on blockchain transaction records, I observed thirteen additional addresses send funds to the al-Qassam Brigades Operational Wallet. The gas fees for these transactions were paid via the same Gas Wallet. These addresses also displayed the same transactional patterns as the addresses that were obtained by the FBI Confidential Human Sources. Based on my training and experience, in conjunction with the patterns observed and described in this investigation, I believe all of the following eight account addresses below are additional donation addresses that fund[@]alqassam.ps sent to donors as part of the FTO funding activity:

| | |
|---|---|
| TQaNC6oaN8TVtvbVv7vDZUAhPZrfuP76Vp | ("Target Property 5") |
| TFbDs69t3TmMxbjiVPKeQqeH65VdqnCkRg | ("Target Property 6") |
| TPdbmSXTPnNedsXW2smdztWFRTozomoxmc | ("Target Property 7") |
| TXtUP3zCt87Y3ayq6zycmPWQnoSoiaLYML | ("Target Property 8") |
| TU8JS7nMLX6aEgNeTM8px3Szq6tUx8Z8Vu | ("Target Property 9") |
| TCZWe2uJkkYNtwan8eEmziXUp7e3Pg4zA2 | ("Target Property 10") |
| TTL4Dc7iv27iQBDejyXtrSSQoYBf6WLWec | ("Target Property 11") |
| TGmLbZiS4SAhxDwmQteQ2fhsKJQ7VfJLsv | ("Target Property 12") |
| THeKAQbUnV58Hnt8WxwwXaC4EjzTquoVes | ("Target Property 14") |
| TL4MeyPRooqL9UhCiqAHww7u2pNYs6guJS | ("Target Property 15") |
| TSxBp5UrV7HDp7Zu5EJc1ijDWGWhwsfBFK | ("Target Property 16") |
| TTzRqud2nVZJUSahxspmqjTHZKmfj3d9Uc | ("Target Property 17") |
| TX8VZHoXwwGDvL75m7cZee1gyipac3p5PQ | ("Target Property 18") |

68.     Furthermore, in your affiant's training and experience, donations to the al-Qassam Brigades within this terrorist financing network are consolidated in the al-Qassam Brigades Operational Wallet before being transferred out. I have observed this financing network over multiple weeks and know most of the donation funds at any given time are stored in the al-Qassam Brigades Operational Wallet. Based on my above analysis and regular tracing of virtual currency discussed above, I believe the al-Qassam Brigades Operational Wallet is the main consolidation point of this

terrorist financing network. The al-Qassam Brigades Operational Wallet is:

| TA3aQxRwocYytqZBKqMPHPZT6pYvwGjLg1 | ("**Target Property 13**") |
|---|---|

69.     The USDT within **Target Properties 1-18** was successfully frozen by Tether at the request of the U.S. government. On the morning of March 10, 2025, I submitted a freeze request to Tether to freeze funds contained in the Target Properties. At the time of the request, the approximate value in the Target Properties was 90,000 USDT. Tether processed this request and enacted the freeze approximately 45 hours later, on the morning of March 12, 2025. Within the time period between the request and freeze, the majority of funds moved out from the Target Properties. At the time of the freeze, Tether reported that the total amount contained in the Target Properties was approximately 2,740 USDT.

## II.    Binance Accounts

70.     I was told by an investigator at Binance, that Binance took independent action on related accounts within this financing network prior to the freeze request that was submitted on or about March 10, 2025. On or about March 12, 2025, I received records from Binance that I had requested the previous day, which showed account information related to individuals who had received funds directly from the al-Qassam Brigades Operational Wallet. These Binance User Identifications were associated with accounts that all belonged to users with foreign identification documents and addresses:

| 25065570 | ("**Target Property 19**") |
|---|---|
| 581991390 | ("**Target Property 20**") |
| 142810781 | ("**Target Property 21**") |

71.     Binance User Identification **25065570,** hereinafter referred to as **Target Property 19**, received a total of 60,800 USDT directly from the al-Qassam Brigades Operational Wallet or

the Gas Wallet. These funds were deposited into the account via ten transfers occurring between April 12, 2024, and February 2, 2025. As of March 12, 2025, the total amount held in the account was 106,013.519434 USDT. According to records from Binance, **Target Property 19** was owned by an individual who held a Palestinian passport and had recent internet protocol ("IP") address logins from Israel, and Gaza.

72.     Binance User Identification **581991390,** hereinafter referred to as **Target Property 20**, received a total of 11,800 USDT directly from the al-Qassam Brigades Operational Wallet. These funds were deposited into the account via four transfers occurring between January 7, 2025, and February 3, 2025. As of March 12, 2025, the total amount held in the account was 2,447.53999311 USDT. According to records from Binance, **Target Property 20** was owned by a Palestinian individual who held a Turkish driver's license and had recent IP address logins from Turkey, Egypt, and Oman.

73.     Binance User Identification **142810781**, hereinafter referred to as **Target Property 21**, received a total of 111,000 USDT directly from the al-Qassam Brigades Operational Wallet. These funds were deposited into the account via fourteen transfers occurring between January 23, 2025, and March 6, 2025. As of March 12, 2025, the total amount held in the account was 2,788.69466176 USDT. **Target Property 21** was owned by a Palestinian individual who held permanent residence in Turky and had recent IP address logins from the Netherlands.

74.     The above three Binance user accounts are included in the requested seizure warrant based on the transfers they received from the al-Qassam Brigades Operational Wallet and the Gas Wallet. Because of these links, I believe the **Target Properties 19** through **21** belong to financiers enabling a virtual currency donation network to support HAMAS. Furthermore, based on my training and experience, I have reason to believe all funds contained in the **Target Properties** are

35

connected to terrorist financing, as account records show donations from unattributed addresses that appear to be over-the-counter services used to obfuscate the origin of funds. Separately, because of the suspicious activity associated with **Target Properties 19** through **21**, Binance took independent action temporarily to freeze those accounts.

## SEIZURE PROCEDURE FOR THE TARGET PROPERTIES

75.    A protective or restraining order issued pursuant to 21 U.S.C. § 853(e) would be insufficient to ensure the availability of the funds in the Target Addresses. Virtual currency can be transferred faster than traditional bank funds, and once transferred, generally cannot be recalled to an original wallet. Moreover, there is a risk that the funds may be moved to a location where no forfeiture or seizure would be possible, at which point the funds could be further laundered into a "privacy" (i.e., untraceable) virtual currency. Thus, a seizure warrant is the only means to reasonably assure the availability of the funds in the Target Properties for forfeiture.

76.    Based on the forgoing, I request that the Court issue the proposed seizure warrant. Because the warrant will be served on Tether and Binance, who will then collect the funds at a time convenient to them and wire the funds to the Government, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

77.    Should this seizure warrant be granted, law enforcement intends to work with the providers listed above in Paragraph 1 to seize the funds contained within the Target Properties by transferring the funds (or the equivalent value of currently frozen funds) to U.S. government-controlled virtual currency wallets.

78.    The seized currency will remain in the custody of the U.S. government pending completion of the forfeiture proceedings, to ensure that access to or manipulation of the forfeitable property cannot be made absent court order or, if forfeited to the United States, without prior

consultation by the United States.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

79.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this application for a Seizure Warrant. I submit that staff from the U.S. Attorney's Office or the National Security Division are capable of identifying my voice and telephone number for the Court.

## CONCLUSION

80.    Based on the forgoing, I request that the Court issue the proposed seizure warrants. Because the warrants will be served on the virtual asset service providers, which will then collect the funds at a time convenient to them and transfer those funds to the government, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,



Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on March 25, 2025.

Digitally signed by
Matthew J. Sharbaugh
Date: 2025.03.25
17:29:18 -04'00'

HONORABLE MATTHEW J. SHARBAUGH
UNITED STATES MAGISTRATE JUDGE